## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT CINCINNATI

|  |  |
|---|---|
| LISA A. SIGETICH, individually, and as representative of a Class of Participants and Beneficiaries of the The Kroger Co. 401(k) Retirement Savings Account Plan,<br><br>Plaintiffs,<br><br>v.<br><br>THE KROGER CO., and THE BOARD OF DIRECTORS OF THE KROGER CO., and JOHN DOES 1-30,<br><br>Defendants | Case No.<br><br>CLASS ACTION COMPLAINT FOR CLAIMS UNDER 29 U.S.C. § 1132(A)(2) |

COMES NOW Plaintiff, Lisa A. Sigetich, individually and as representative of a Class of Participants and Beneficiaries on behalf of The Kroger 401(k) Retirement Savings Account Plan (the "Plan"), by her counsel, WALCHESKE & LUZI, LLC, and STRAUSS TROY CO, LPA, as and for a claim against Defendants, alleges and asserts to the best of her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## **INTRODUCTION**

1.      The essential remedial purpose of the Employee Retirement Income Security Act ("ERISA") is "to protect the beneficiaries of private pension plans." *Nachwalter v. Christie*, 805 F.2d 956, 962 (11th Cir. 1986).

2.      The law is settled that ERISA fiduciaries have a duty to evaluate fees and expenses when selecting investments *as well as* a continuing duty to monitor fees and expenses of selected investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015); 29 U.S.C. § 1104(a)(1)(A) (fiduciary duty includes "defraying reasonable expenses of administering

the Plan"); 29 C.F.R. § 2250.404a-1(b)(i) (ERISA fiduciary must give "appropriate consideration to those facts and circumstances" that "are relevant to the particular investment."). It is for good reason that ERISA requires fiduciaries to be cost-conscious:

> Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution Plan." *Tibble*, 135 S. Ct. at 1826, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.

*Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019).

3.       Defendants, The Kroger Co. ("Kroger"), the Board of Directors of The Kroger Co. ("Board Defendants"), and John Does 1-30 (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as The Kroger Co. 401(k) Retirement Savings Account Plan ("The Plan") – that it sponsors and provides to its employees.

4.       Plaintiff alleges that during the putative Class Period (November 5, 2015 through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA, 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiff, and to the other participants of the Plan by, among other things: (1) authorizing the Plan to pay unreasonably high fees for recordkeeping services; and (2) failing to disclose to Plan Participants fees associated with the Plan.

5.       These objectively unreasonable recordkeeping fees cannot be justified. Defendants' failures breached the fiduciary duties they owed to Plaintiff, Plan Participants, and beneficiaries. Prudent fiduciaries of 401(k) Plans continuously monitor fees against the market rates, applicable benchmarks, and peer groups to identify objectively unreasonable and unjustifiable fees. Defendants did not engage in a prudent decision-making process, as there is no other explanation

for why the Plan paid these objectively unreasonable fees for recordkeeping and investment management.

6.      To remedy, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from their breaches of fiduciary duty.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 et seq.

8.      This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

9.      Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within the District.

10.     In conformity with 29 U.S.C. §1132(h), Plaintiff served the Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

11.     Plaintiff, Lisa A. Sigetich, is a resident of the State of Wisconsin and currently resides in Milwaukee, Wisconsin, and during the Class Period, was a participant in the Plan under 29 U.S.C. § 1002(7).

3

12.     Ms. Sigetich was a Customer Service Representative at a Kroger in Wisconsin, and she is currently on disability leave. Her last day of work was August 12, 2020.

13.     Plaintiff has Article III standing to bring this action on behalf of the Plan because she suffered an actual injury to her own Plan account, that injury is fairly traceable to Defendants' unlawful conduct, and the harm is likely to be redressed by a favorable judgment.

14.     It is well settled, moreover, that recovery may be had for the Class Period before Plaintiff personally suffered injury, as that turns on ERISA § 502(a)(2) on which her claim rests. This claim is brought in a representative capacity on behalf of the Plan as a whole and remedies under ERISA § 409 protect the entire Plan. Courts have recognized that a plaintiff with Article III standing, like Plaintiff, may proceed under ERISA § 502(a)(2) on behalf of the Plan and all participants in the Plan. Plaintiff may seek relief under ERISA § 502(a)(2) that sweeps beyond her own injury and beyond any given investment she has held as a Participant in the Plan.

15.     The named Plaintiff and all Participants in the Plan suffered ongoing financial harm as a result of Defendants imprudent and unreasonable recordkeeping fee decisions made with regard to the Plan.

16.     The named Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the recordkeeping fees) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

17.     The named Plaintiff and all Participants in the Plan, having never managed a large 401(k) Plan such as this Plan, lacked actual knowledge of reasonable fee levels available to such Plans. Further, Plaintiff did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting and

monitoring the Plan's recordkeeper) because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon the facts set forth below.

18.     The Kroger Co. ("Kroger") has nearly 2800 stores in 35 states under two dozen different banners and annual sales of more than $132.5 billion. It is one of the world's largest retailers. Kroger's headquarters are located at 1014 Vine St., Cincinnati, OH 45202.  In this Complaint, "Kroger" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

19.     Kroger acted through its officers, including the Board Defendants, and their members (John Does 1-10), to perform Plan-related fiduciary functions in the course and scope of their business. Kroger appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Kroger is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

20.     Kroger is both the Plan sponsor and the Plan Administrator of The Kroger 401(k) Retirement Savings Account Plan.

21.     As the Plan Administrator, Kroger is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). It has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a). Kroger has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

22.     Kroger in its Plan Administrator capacity, as well as individuals who carried out Plan administrator functions (John Does 11-20), are collectively referred to herein as the "Plan

Administrator Defendants."

23.     To the extent that there are additional officers and employees of Kroger who are or were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Kroger officers and employees who are or were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

24.     The Plan is a Section 401(k) "defined contribution" pension Plan under 29 U.S.C. § 1102(2)(A) and 1002(34), meaning that Kroger's contribution to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution Plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly performing investments are borne by the participants.

25.     The Plan currently has about $5,901,895,000 in assets entrusted to the care of the Plan's fiduciaries. The Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not sufficiently attempt to reduce the Plan's expenses or exercise appropriate judgment to monitor its recordkeeper to ensure it was a prudent choice.

26.     With 92,210 participants in the year 2019, the Plan had more participants than 99.99% of the defined contribution Plans in the United States that filed 5500 forms for the 2019

Plan year. Similarly, with $5,901,895,000 in assets in the year 2019, the Plan had more assets than 99.98% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year.

## ERISA'S FIDUCIARY STANDARDS

27.     ERISA imposes strict fiduciary standards of loyalty and prudence on Defendants as a Plan fiduciaries. 29 U.S.C. § 1104(a)(1) provides in relevant part:

> [A] fiduciary shall discharge his duties with respect to a Plan solely in the interest of the participants and beneficiaries and –
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the Plan; [and]
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

28.     With certain exceptions, 29 U.S.C. § 1103(c)(1) provides in relevant part:

> [T]he assets of a Plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan.

29.     29 U.S.C. § 1109 provides in relevant part:

> Any person who is a fiduciary with respect to a Plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such Plan any losses to the Plan resulting from each such breach, and to restore to such Plan any profits of such fiduciary which have been made through use of assets of the Plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

30.     Under ERISA, fiduciaries that exercise any authority or control over Plan assets, including the selection of Plan service providers, must act prudently and for the exclusive benefit of participants in the Plan, and not for the benefit of third parties including service providers to the

Plan such as recordkeepers. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (Plan assets "shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan").

31.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act §7.

32.     29 U.S.C. § 1132(a)(2) authorizes Plan Participants to bring a civil action for appropriate relief under 29 U.S.C. § 1109.

## DEFINED CONTRIBUTION INDUSTRY

33.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. Among many options, employers may make contributions on behalf of all employees and/or make matching contributions based on the employees' elective deferrals. Employees with money in a plan are referred to as "Participants."

34.     Defined Contribution plan fiduciaries virtually always hire service providers to deliver a retirement plan benefit to their employees. There is a large group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of virtually all retirement plans.

35.     These recordkeepers deliver all the essential recordkeeping and related administrative ("RK&A") services through standard bundled offerings.

8

36.     There are two types of essential RK&A services provided by all recordkeepers. For large plans with substantial bargaining power (like the Plan), the first type, "Bundled RK&A," is provided as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided in retirement industry parlance on an "all-you-can-eat" basis). The Bundled RK&A services include, but are not limited to, the following standard services:

a.   Recordkeeping;

b.   Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c.   Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d.   Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.   Maintenance of an employer stock fund (if needed);

f.   Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.   Plan consulting services including assistance in selecting the investments offered to participants;

h.   Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

i.   Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

j.   Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

37.     The second type of essential RK&A services, hereafter referred to as "Ad Hoc RK&A" services, provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees). The rationale is, for example, that one participant who does not take out a loan should not

pay fees to cover the costs of other participants who choose to take a loan. These "Ad Hoc RK&A" services typically include, but are not limited to, the following:

      a.   Loan Processing;
      b.   Brokerage services/account maintenance (if offered by the plan);
      c.   Distribution services; and
      d.   Processing of Qualified Domestic Relations Orders (QDROs).

38.    For large plans with more than 90,000 participants or more, like this Plan, any minor variations in the way that these two types of essential RK&A services, as well as any other RK&A services included in the bundled offering of RK&A services, are delivered has no material impact on the fees charged by recordkeepers.

39.    All recordkeepers quote fees for the Bundled RK&A services on a per participant basis without regard for any individual differences in services requested -- which are treated by the recordkeepers as immaterial because they are, in fact, inconsequential from a cost perspective to the delivery of the Bundled RK&A services.

40.    The vast majority of fees earned by recordkeepers come from the bundled fee for providing the Bundled RK&A services as opposed to the Ad Hoc RK&A services.

41.    The Plan had a standard package of Bundled RK&A Services and Ad Hoc RK&A services as described above.

42.    Recordkeepers offer the same bundles and combinations of services as their competitors. As a result, the market for defined contribution retirement plan services has become increasingly price competitive, particularly for large plans that, like this Plan, have a sizable number of participants and a large amount of assets.

43.    Over the past twenty years, the fees that recordkeepers have been willing to accept for providing retirement plan services has significantly decreased. Recordkeepers are willing (or competitively required) to accept a lower and more competitive fee as a result of, among other

things, the competitive pressures created by greater information becoming available to plan fiduciaries and the reduction in opaque fee structures.

44.     By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing RK&A has stabilized, and has not materially changed for large plans, including the Plan. In other words, reasonable recordkeeping fees paid in 2019 are representative of the reasonable fees during the entire Class Period.

45.     The underlying cost to a recordkeeper of providing recordkeeping to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan.

46.     The incremental cost for a recordkeeper to provide recordkeeping for a participant's account does not materially differ from one participant to another and is not dependent on the balance of the participant's account.

47.     Recordkeepers for relatively larger defined contribution plans, like this Plan, experience certain efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants increase because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low.

48.     Therefore, while the total cost to a recordkeeper to deliver Bundled RK&A services increases as more participants join the Plan, the cost per participant to deliver Bundled RK&A services decreases.

49.     All else being equal, as a plan gains more participants, the reasonable market rate for the services provided by the recordkeeper will decline.  In other words, the reasonable market rate for recordkeeping for a plan with more participants will be lower than the reasonable market rate for a plan with fewer participants.

50.    Since at least the early 2000s, plan fiduciaries and their consultants and advisors have been aware of this cost structure dynamic for recordkeepers.

51.    Since at least the early 2000s, Defendants should have been aware of this cost structure dynamic for recordkeepers.

52.    The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

53.    As a result, recordkeepers often make separate contractual arrangements with mutual fund providers. For example, recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

54.    For example, if a mutual fund has a total expense ratio fee of 0.75%, the mutual fund provider may agree to pay the recordkeepers 0.25% of the 0.75% total expense ratio fee that is paid by the investor in that mutual fund (in this context, the Plan Participant). That 0.25% portion of the 0.75% total expense ratio fee is known as the "revenue sharing."

55.    Recordkeepers typically collect their fees through direct payments from the Plan or through indirect compensation such as revenue sharing, or some combination of both.

56.    Regardless of the pricing structure that the plan fiduciary negotiates with any service provider, the amount of compensation paid to service providers, including the recordkeepers, must be reasonable.

57.    As a result, plan fiduciaries must understand the total dollar amounts paid to the recordkeeper and be able to determine whether the compensation is reasonable by understanding the market for such recordkeeping services.

58.     During the Class Period, Defendants knew and were aware that a Plan with more participants can and will receive a lower effective per participant recordkeeping fee when evaluated on a per participant basis.

59.     During the Class Period, Defendants knew and/or were aware that the Plan should have received a lower effective per participant recordkeeping fee when evaluated on a per participant basis.

**THE PLAN**

60.     During the entire Class Period, the Plan received recordkeeping services from Bank of America, N.A. and Merrill Lynch ("collectively "Merrill Lynch").

61.     At all relevant times, the Plan's recordkeeping fees were excessive when compared with other comparable 401(k) Plans offered by other sponsors that had similar numbers of plan participants, and similar amounts of money under management.

62.     The fees were also excessive relative to the recordkeeping services received since the same services are generally offered to Plans of this size on an "all you can eat basis," regardless of the number of services selected by the Plan.

63.     These excessive Plan fees led to lower net returns than participants in comparable 401(k) Plans enjoyed.

64.     During the Class Period, Defendants breached their duties owed to the Plan, to Plaintiff and all other Plan Participants, by: (1) authorizing the Plan to pay unreasonably high fees for recordkeeping services; and (2) failing to disclose to Plan Participants fees associated with the Plan.

65.     Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan Participants and their beneficiaries, breached their fiduciary duties of prudence and loyalty in

violation of 29 U.S.C. § 1104, and caused Plaintiff and members of the Class significant harm to their Plan accounts.

**STANDARD OF CARE FOR PRUDENT FIDUCIARIES
SELECTING & MONITORING RECORDKEEPERS**

66.     A plan fiduciary is required to fully understand all sources of revenue received by all service providers, including its recordkeeper. It must regularly monitor that revenue to ensure that the compensation received is, and remains, reasonable for the services provided.

67.     Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by soliciting competitive bids from other recordkeepers to perform the same services currently being provided to the Plan. This is not a difficult or complex process and is performed regularly by prudent plan fiduciaries.

68.     Prudent plan fiduciaries can easily receive a quote from other recordkeepers to determine if the current level of recordkeeping fees is reasonable.

69.     Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee and move to a new recordkeeper to provide the same (or better) services for a more competitive reasonable fee if necessary.

70.     A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated recordkeeping fees. To receive a truly "reasonable" recordkeeping fee in the prevailing market, prudent plan fiduciaries engage in some form of solicitation of a competitive bid on a regular basis.

71.     The employer/plan sponsor can pay the recordkeeping fee on behalf of participants, which is the most beneficial to plan participants. If the employer were paying the fee, the employer would have an interest in negotiating the lowest fee a suitable recordkeeper would accept.

72.     Usually, however, the employer decides to have the plan (plan participants) pay the

14

recordkeeping fee. If the recordkeeping fee is paid by plan participants, plan fiduciaries can allocate the negotiated fee among participant accounts on a per capita or pro-rata basis.

73.     For example, if the plan negotiates a per participant revenue threshold of $20.00 for the Bundled RK&A, the plan does not need to require that each participant pay $20.00. Rather, the plan fiduciary could determine that an asset-based fee is more appropriate for plan participants and allocate the Bundled RK&A fee pro rata to participants. For example, a 5,000 participant-plan with a $20.00 revenue threshold would pay $100,000 for recordkeeping. If the plan had $1,000,000,000 in assets, then the $100,000 would work out to one (1) basis points. Accordingly, the plan fiduciary could allocate the $100,000 fee to plan participants by requiring that each participant pay one (1) basis points for recordkeeping.

74.     Regardless of the pricing structure, and Plaintiff states no preference, plan fiduciaries must ensure that the fee paid to the recordkeeper for recordkeeping is reasonable.

75.     All of these standards were accepted and understood by prudent plan fiduciaries, including Defendants, at all times during the Class Period.

76.     For example, fiduciary best practices based on DOL guidelines, case law, and marketplace experience are as follows:

      1. Price administrative fees on a per-participant basis.

      2. Benchmark and negotiate recordkeeping and investment fees separately.

      3. Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size.

      4. Benchmark and negotiate recordkeeping and trustee fees at least every other year.

      ……

      7. Review services annually to identify opportunities to reduce administrative costs.[1]

---

[1] "Fiduciary Best Practices," DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance, Mercer Investment Consulting (2013).

77.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's RPS costs. *Tussey v. ABB, Inc.,* 746 F.3d 327, 336 (8th Cir. 2014).

78.     First, a plan fiduciary must pay close attention to the recordkeeping fees being paid by the Plan. A hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

79.     Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

80.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.

81.     By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for substantially similar recordkeeping services and have an idea of a starting point for negotiation.

82.     Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids.

## PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR RECORDKEEPING FEES AND THE PLAN THUS PAID UNREASONABLE RECORDKEEPING FEES

83.     A plan fiduciary must continuously monitor its recordkeeping fees by regularly

soliciting competitive bids to ensure fees paid to as recordkeepers are reasonable.

84.     During the Class Period, Defendants knew or should have known that they must regularly monitor the Plan's recordkeeping fees paid to recordkeepers, including but not limited to Merrill Lynch.

85.     During the Class Period, Defendants failed to regularly monitor the Plan's recordkeeping fees paid to recordkeepers, including but not limited to Merrill Lynch.

86.     During the Class Period, Defendants knew or should have known that they must regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Merrill Lynch, in order to avoid paying objectively unreasonable recordkeeping fees.

87.     During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Merrill Lynch, in order to avoid paying unreasonable recordkeeping fees.

88.     During the Class Period, Defendants knew or should have known that it was in the best interests of the Plan's Participants to ensure that the Plan paid no more than a competitive reasonable fee for recordkeeping.

89.     During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants failed to ensure that the Plan paid no more than a competitive reasonable fee for recordkeeping.

90.     During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was done ineffectively given the objectively unreasonable recordkeeping fees.

91.     During the Class Period and because Defendants failed to regularly monitor the Plan's recordkeeping fees, including those paid to Merrill Lynch, the Plan's recordkeeping fees were significantly higher than they would have been had Defendants engaged in this process.

92.     During the Class Period, the Plan fiduciaries permitted Plaintiff and members of the Class to pay excessive recordkeeping fees through direct deductions from their accounts, regardless of which investment options were chosen by Plaintiff or members of the Class.

93.     From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below shows the actual year-end participants and annual recordkeeping fees illustrating that the Plan had on average 87,010 participants with account balances and paid an average effective annual recordkeeping fee of at least approximately $2,610,288 which equates to an average of at least approximately $30 per participant. These are the minimum amounts that could have been paid.

### Retirement Plan Services (RPS) Fees

|  | 2015 | 2016 | 2017 | 2018 | 2019 | *Average* |
|---|---|---|---|---|---|---|
| **Participants** | 83,482 | 79,408 | 89,943 | 90,005 | 92,210 | *87,010* |
| **Est. RPS Fees** | $2,504,460 | $2,382,240 | $2,698,290 | $2,700,150 | $2,766,300 | *$2,610,288* |
| **Est. RPS Per Participant** | $30 | $30 | $30 | $30 | $30 | *$30* |

94.     From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below illustrates the annual recordkeeping fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual recordkeeping fees paid by the Plan (as identified in the table above).

**Comparable Plans' Recordkeeping Fees Based on Publicly Available Information[1]**

| Plan | Participants | Assets | RPS Fee | RPS Fee /pp | Recordkeeper | Graph Color |
|------|-------------|--------|---------|-------------|--------------|-------------|
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $3,104,524,321 | $1,298,775 | $27 | Vanguard | White |
| Fidelity Retirement Savings Plan[2] | 58,163 | $16,119,398,751 | $814,282 | $14 | Fidelity | White |
| Sutter Health 403(B) Savings Plan | 73,408 | $3,681,162,013 | $1,908,133 | $26 | Fidelity | White |
| Google LLC 401(K) Savings Plan | 82,725 | $11,786,824,293 | $1,676,414 | $20 | Vanguard | White |
| **Kroger Plan Average Fee** | **87,010** | **$4,763,655,000** | **$2,610,288** | **$30** | **Merrill Lynch** | **Red** |
| Marriott International, Inc. Employees' Profit Sharing Retirement And Savings Plan And Trust | 115,501 | $7,660,619,525 | $2,636,322 | $23 | Alight | White |
| Apple 401(K) Plan | 115,686 | $7,400,046,748 | $2,114,871 | $18 | Great-West | White |
| Lowes 401(K) Plan | 154,402 | $5,619,838,861 | $2,856,437 | $19 | Wells Fargo | White |

[1]Price calculations are based on 2018 Form 5500 information.
[2]Stipulation of Fact, Moitoso, et al., v FMR LLC, et al., Case 1:18-cv-12122-WGY, Document 138-67, Exhibit 65, p. 3.

95.     Based on information contained in the 5500 Form, each of the comparable plans above received all the standard and virtually identical recordkeeping services that the Kroger Plan received.

96.     From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the graph below illustrates the annual recordkeeping fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual recordkeeping fees paid by the Plan (as identified in the table above), with the white data points representing recordkeeping fees that recordkeepers offered to (and were accepted by) comparable Plans.



97.     From the years 2015 to 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrates that the Plan paid an effective average annual recordkeeping fee of at least $30 per participant for recordkeeping.

98.     From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual recordkeeping fee of around $20 per participant, if not lower.

99.     From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with similar amounts of money under management, had Defendants been acting in the exclusive best interest of the Plan's Participants the Plan actually would have paid significantly less than an average of approximately $2,610,288

per year in recordkeeping fees, which equated to an effective average of approximately $30 per participant per year.

100. From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, had Defendants been acting in the best interests of the Plan's Participants, the Plan actually would have paid on average a reasonable effective annual market rate for recordkeeping of approximately $1,740,192 per year in recordkeeping fees, which equates to approximately $20 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay 50% more than what they could otherwise pay for recordkeeping.

101. From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the Plan cost its Participants on average additionally approximately $870,096 per year in recordkeeping fees, which equates to on average approximately $10 per participant per year.

102. From the years 2015 to 2019, and because Defendants did not act in the best interests of the Plan's Participants, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its Participants a total minimum amount of approximately $4,350,480 in unreasonable and excessive recordkeeping fees.

103. From the years 2015 to 2019 based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, because Defendants did not act in the best interests of the Plan's Participants, and as compared to other

plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its Participants (when accounting for compounding percentages) a total, cumulative amount in excess of $5,882,580 in recordkeeping fees.

104.    Plaintiff paid these excessive recordkeeping fees in the form of direct compensation as an investor in the Plan's Retirement Date Fund 2030, and thus, suffered an injury to her individual Plan account.

105.    During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not regularly and/or reasonably assess the Plan's recordkeeping fees it paid to Merrill Lynch.

106.    During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the recordkeeping fees it paid to Merrill Lynch vis-à-vis the fees that other recordkeeping providers would charge, and would have accepted, for the same services.

107.    During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's recordkeeping fees it paid to Merrill Lynch, but Defendants either simply failed to do so, or did so ineffectively given that it paid more than 50% higher for recordkeeping fees than it should have.

108.    During the entirety of the Class Period and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the recordkeeping fees it paid to Merrill Lynch, it would have realized and understood that the Plan was compensating Merrill Lynch unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and Plan Participants.

109.    These recordkeeping fees were also excessive relative to the RPS services received,

since such services are standard for very large 401(k) plans like the Plan here.

110. During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher recordkeeping fees than they should have been and/or by failing to take effective remedial actions as described herein, Defendants breached their fiduciary duties of loyalty and prudence to Plaintiff and Plan Participants.

111. Plaintiff paid these excessive recordkeeping fees in the form of direct compensation as an investor in the Vanguard Institutional Target Retirement 2035 fund, and thus, suffered an injury to her Plan account.

112. During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not regularly and/or reasonably assess the Plan's recordkeeping fees it paid to Merrill Lynch.

113. During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the recordkeeping fees it paid to Merrill Lynch vis-à-vis the fees that other recordkeepers would charge for the materially same services.

114. During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's administrative costs and recordkeeping fees it paid to Merrill Lynch, but Defendants either simply failed to do so, or did so ineffectively given that it paid almost 100% higher for recordkeeping fees than it should have.

115. During the entirety of the Class Period and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the recordkeeping fees it paid to Merrill Lynch, it would have realized and understood that the Plan was compensating Merrill

23

Lynch unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fees to Plaintiff and Plan Participants.

116. The Plan recordkeeping fees were also excessive relative to the recordkeeping services received, since such services are standard for very large 401(k) plans like this Plan and are provided on an "all-you-can-eat-basis," based on primarily on the number of participants a plan has. In other words, any difference in recordkeeping fees between comparable Plans are not explained by the different services each recordkeeper may have provided.

117. During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher recordkeeping fees than they should have been and by failing to take effective remedial actions as described herein, Defendants breached their fiduciary duties of loyalty and prudence to Plaintiff and Plan Participants.

## FAILURE TO ACCURATELY DISCLOSE FEES CHARGED FOR PLAN INVESTMENTS

118. ERISA imposes a duty on plan administrators to provide to plan participants on a "regular and periodic basis . . . sufficient information regarding the plan, including fees and expenses, and regarding designated investment alternatives, including fees and expenses attendant thereto, to make informed decisions with regard to the management of their individual accounts." 29 C.F.R. §2550-404a-5(a).

119. In order to satisfy this requirement, a plan administrator must provide (among other things) (1) an "identification of any designated investment managers," (2) "an explanation of any fees and expenses that may be charged against the individual account of a participant or beneficiary… not reflected in the total annual operation expenses of any designated investment alternatives," and (3) "at least quarterly, a statement" reflecting the dollar amount and nature of those expenses "actually charged," along with a "description of the services to which the charges

relate." 29 C.F.R. §2550- 404a-5(b)-(d).

120.     Defendants failed to properly disclose the fees charged to Participants in the Plan in their 404a-5 participant fee disclosure documents.

121.     In the participant fee disclosure documents, the performance data as of July 21, 2021, shows that the "Annual Gross Expense Ratio," for all Plan Investments was "0.00" "[a]s a %," or "$.00." "[per] $1000."  Clearly, this is inaccurate as in participant quarterly disclosures, including Plaintiff's quarterly statements from 2021, the same funds show a higher than "0" gross expense ratio percentage.

122.     For instance, Plaintiff invested in the Retirement Date Fund 2030, which shows a .26 gross expense ratio percentage on her 2021 quarterly statements. On the other hand, the 2021 participant fee disclosure states that the gross expense ratio percentage for the exact same fund at the same exact same time is .00.

123.     As a result of inconsistent fee disclosures, Plaintiff and Plan Participants are not able to determine how much they actually paid for Plan investments provided by Merrill Lynch, nor can Plan Participants calculate the net fee they paid for designated investment alternatives.

124.     Without accurate expense ratio information, Plaintiff and Plan Participants cannot make "informed decisions with regard to the management of their individual accounts." 29 C.F.R. §2550-404a- 5(a).

125.     The Defendants' inconsistent and incomplete disclosures are a clear violation of ERISA disclosure requirements imposed on all Plan administrators and are also evidence that the Defendants were imprudent in various aspects of Plan administration.

126.     The failure to disclose all the information a Participant would need to make an informed investment decision, as required under 29 C.F.R. §2550-404a-5(a), breached the

fiduciary obligations of prudence and loyalty that Defendants owed to Plaintiff and members of the Class.

127.    Plaintiff and Plan Participants have been damaged through Defendants' incomplete, inconsistent, and erroneous Plan disclosures by not being able to fully understand the fees associated with Plan investments they selected.

## CLASS ACTION ALLEGATIONS

128.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

129.    In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of The Kroger Co. 401(k) Retirement Savings Account Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning November 5, 2015 and running through the date of judgment.

130.    The Class includes over 90,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

131.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

- Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether Defendants breached their fiduciary duties to the Plan;

- What are the losses to the Plan resulting from each breach of fiduciary duty; and

- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

132.     Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a Participant during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

133.     Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because she is a Participant in the Plan during the Class period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

134.     Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

135.     Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

136.     Plaintiff's attorneys are experienced in complex ERISA and class litigation and will

27

adequately represent the Class.

137.     The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

138.     The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

139.     Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

140.     Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

**FIRST CLAIM FOR RELIEF**
**Breaches of Duties of Loyalty and Prudence of ERISA, as Amended**
**(Plaintiff, on behalf of herself and Class, Against All Defendants – Recordkeeping Fees)**

141.     Plaintiff restates the above allegations as if fully set forth herein.

142.     Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

143.     29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan.

144.    Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges reasonable recordkeeping fees.

145.    During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's recordkeeping fees were reasonable; properly disclose the fees charged to Participants in the Plan in their quarterly statements or fee disclosures, manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

146.    During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiff, by failing to: ensure that the Plan's recordkeeping fees were reasonable, properly disclose the fees charged to Participants in the Plan in their quarterly statements or fee disclosures, manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

147.    During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding recordkeeping and the significant bargaining power the Plan had to negotiate the best fees.

148.    During the Class Period, Defendants breached their duty to Plan Participants, including Plaintiff, by failing to employ a prudent and loyal process and by failing to critically or objectively evaluate the cost and performance of the Plan's recordkeeper in comparison to other recordkeeper options.

149.    Through these actions and omissions, Defendants breached their fiduciary duties of

prudence and loyalty with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(A), (B).

150. Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

151. As a result of Defendants' breach of fiduciary duty of prudence and loyalty with respect to the Plan, the Plaintiff and Plan Participants suffered objectively unreasonable and unnecessary monetary losses.

152. Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of herself and Class, Against All Defendants – Recordkeeping Fees)**

153. Plaintiff restates the above allegations as if fully set forth herein.

154. Defendants had the authority to appoint and remove members or individuals responsible for Plan recordkeeping fees and for properly disclosing the fees charged to Participants in the Plan, and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

155. In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan recordkeeping fees and for properly disclosing the fees charged to Participants in the Plan to ensure that they were adequately performing their fiduciary obligations, and to take

prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

156.    Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

157.    The excessive recordkeeping fees paid by the Plan, and the lack of consistent and complete disclosures of fees charged to Participants in the Plan, inferentially suggest that Kroger and the Board breached their duty to monitor by, among other things:

a.    Failing to monitor and evaluate the performance of individuals responsible for Plan recordkeeping fees and fee disclosures or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high recordkeeping expenses;

b.    Failing to monitor the process by which the Plan's recordkeeper was evaluated and failing to investigate the availability of lower-cost recordkeepers; and

c.    Failing to remove individuals responsible for Plan recordkeeping fees and fee disclosure whose performance was inadequate in that these individuals continued to pay the same recordkeeping costs and failed to make the required Plan disclosures even though benchmarking and using other similar comparators would have showed that maintaining Merrill Lynch as the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan Participants' retirement savings.

158.    As the consequences of the foregoing breaches of the duty to monitor for recordkeeping fees and Plan disclosures the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses.

159.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan recordkeeping fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.    A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligation;

E.    An Order requiring Defendant Kroger to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Kroger as necessary to effectuate relief, and to prevent Kroger' unjust enrichment;

F.    An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.   An award of pre-judgment interest;

I.   An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.   Such other and further relief as the Court deems equitable and just.

Dated this 5th day of November, 2021

                                    /s/ Robert R. Sparks
                                 Robert R. Sparks, OH 0073573
                                 **STRAUSS TROY**
                                 Federal Reserve Building
                                 150 E. 4th Street, 4th Floor
                                 Cincinnati, OH 45202-4018
                                 Telephone: (513) 621-2120
                                 Email: rrsparks@strausstroy.com

James A. Walcheske, State Bar No. 1065635
Scott S. Luzi, State Bar No. 1067405
Paul M. Secunda, State Bar No. 1074127
**WALCHESKE & LUZI, LLC**
235 Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com

Counsel for Plaintiffs