UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINICINNATI

| | |
|---|---|
| LISA A. SIGETICH, individually, and as representative of a Class of Participants and Beneficiaries of the The Kroger Co. 401(k) Retirement Savings Account Plan, | Case No. 1:21-Cv-00697-SJD (SKB) |
| Plaintiff, | Judge Susan J. Dlott |
| v. | Magistrate Judge Stephanie K. Bowman |
| THE KROGER CO., and THE BOARD OF DIRECTORS OF THE KROGER CO., and JOHN DOES 1-30, | CLASS ACTION AMENDED COMPLAINT FOR CLAIMS UNDER 29 U.S.C. § 1132(a)(2) |
| Defendants | |

COMES NOW Plaintiff, Lisa A. Sigetich, individually and as representative of a Class of Participants and Beneficiaries on behalf of The Kroger 401(k) Retirement Savings Account Plan (the "Kroger Plan or "Plan"), by her counsel, WALCHESKE & LUZI, LLC, and STRAUSS TROY, as and for a claim against Defendants, alleges and asserts to the best of her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

<u>INTRODUCTION</u>

1.      Under the Employee Retirement Income Security Act ("ERISA"), 29 U.SC. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA Section

404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). This fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982.)

2.     The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* (citing *Tibble v. Edison Int'l*, 575 U.S. 523 (2015).)

3.     Even in a defined contribution plan in which participants are responsible for selecting their plan investments, *see* ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (citing *Tibble*, 575 U.S. at 529–530). "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time," fiduciaries "breach their duty [of prudence]." *Id.*

4.     Defendants, The Kroger Co. ("Kroger"), the Board of Directors of The Kroger Co. ("Board Defendants"), and John Does 1-30 (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as The Kroger Co. 401(k) Retirement Savings Account Plan ("The Plan") – that it sponsors and provides to its employees.

5.     Plaintiff alleges that during the putative Class Period (November 5,

2015, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping fees," *Hughes*,142 S. Ct. at 739-740, and by failing to remove their high-cost recordkeepers, Bank of America, N.A. and Merrill Lynch ("collectively "Merrill Lynch"), during the Class Period.

6. These objectively unreasonable recordkeeping fees cannot be contextually justified and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742. Defendants breached their duty of prudence by unreasonably failing to leverage the size of the Plan to pay reasonable fees for recordkeeping services.

7. Although Kroger is currently and voluntarily paying part or all of the recordkeeping fees during the Class Period for Plan participants, the Plan's 404a-5 participant disclosures make clear that there is no guarantee that Kroger will continue to pay *any* portion of the Plan recordkeeping fees going forward.

8. ERISA's duty of prudence applies to the *conduct of the plan fiduciaries* in negotiating recordkeeping fees with the recordkeeper based on what is *reasonable* (not cheapest or average) in the applicable market. The duty of prudence is not satisfied by the employer deciding unliterally to pay part of the unreasonable fee because participants may be asked to pay the full unreasonable fee at any time in the future and because Defendants could have negotiated a reasonable recordkeeping fee and received the exact same quality and level of services from Merrill Lynch or an

alternative recordkeeper with the Plan participants paying less.

9. There is no requirement to allege the actual inappropriate fiduciary actions taken because "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which [she] has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016). The fiduciary process can be inferred to be inadequate based on the contextualized facts surrounding the unreasonably high fees Defendants negotiated to pay for Plan recordkeeping fees to Merrill Lynch. *Id.*

10. Because the fiduciary process followed by Defendants led to paying excessive and objectively unreasonable recordkeeping fees to Merrill Lynch given the quality and level of recordkeeping services provided, Defendants breached their fiduciary duty of prudence to Plaintiff and other Plan participants.

11. To remedy this fiduciary breach, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from this breach of the duty of prudence.

### JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 et seq.

13. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

14.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

15.     In conformity with 29 U.S.C. §1132(h), Plaintiff served the initial Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

16.     Plaintiff, Lisa A. Sigetich, is a resident of the State of Wisconsin and currently resides in Milwaukee, Wisconsin, and during the Class Period, was a participant in the Plan under 29 U.S.C. § 1002(7).

17.     Ms. Sigetich was a Customer Service Representative at a Kroger in Wisconsin, and she is currently on disability leave. Her last day of work was February 24, 2021.

18.     Plaintiff has Article III standing to bring this action on behalf of the Plan because she suffered an actual injury to her own Plan account through paying excessive recordkeeping fees, that injury is fairly traceable to Defendants' unlawful conduct in maintaining Merrill Lynch as its recordkeeper, and the harm is likely to be redressed by a favorable judgment providing equitable relief.

19.     Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond her own injury.

20.     The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive recordkeeping fees) necessary to understand that Defendants breached their fiduciary duty of prudence

until shortly before this suit was filed.

21. Having never managed a mega 401(k) Plan, meaning a plan with over $500 million dollars in assets, *see* Center for Retirement and Policy Studies, *Retirement Plan Landscape Report* 18 (March 2022) ("Mega plans have more than $500 million in assets"), such as this Plan, Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to plans.

22. The Kroger Co. ("Kroger") has nearly 2800 store in 35 states under two dozen different banners and annual sales of more than $132.5 billion. It is one of the world's largest retailers. Kroger is located at 1014 Vine St., Cincinnati, OH 45202. In this Complaint, "Kroger" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

23. Kroger acted through its officers, including the Board Defendants, and their members (John Does 1-10), to perform Plan-related fiduciary functions in the course and scope of their business. Kroger appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Kroger is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

24. Kroger is both the Plan sponsor and the Plan Administrator of The Kroger 401(k) Retirement Savings Account Plan.

25. As the Plan Administrator, Kroger is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). It has authority and responsibility for the control, management, and administration of the Plan in

accord with 29 U.S.C. § 1102(a). Kroger has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

26. Kroger in its Plan Administrator capacity, as well as individuals who carried out Plan administrator functions (John Does 11-20), are collectively referred to herein as the "Plan Administrator Defendants."

27. To the extent that there are additional officers and employees of Kroger who are or were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Kroger officers and employees who are or were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

28. The Plan is a Section 401(k) "defined contribution" pension Plan under 29 U.S.C. § 1002(34), meaning that Kroger' contribution to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution Plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

29. In 2019, the Plan had about $5,901,895,000 in assets entrusted to the care of the Plan's fiduciaries. The Plan had substantial bargaining power regarding

the fees. Defendants, however, did not monitor its recordkeeper to ensure it was a prudent and objectively reasonable choice.

30.     With 92,210 participants in the year 2019, the Plan had more participants than 99.99% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year. Similarly, with $5,901,895,000 in assets in the year 2019, the Plan had more assets than 99.98% of the defined contribution plans in the United States that filed 5500 forms for the 2019 Plan year.

**ERISA'S FIDUCIARY STANDARDS**
**DEFINED CONTRIBUTION INDUSTRY**

31.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. An employer may also make matching contribution based on an employee's elective deferrals.

32.     Employees with money in a plan are referred to as "Participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

33.     Although Kroger contributed more than $1 billion in employer matching contributions to Plan participants during the Class Period, these matching contributions are irrelevant to whether a Plan has paid excessive plan recordkeeping fees.

34.     While contributions to a plan account and the earnings on investments will increase retirement income, fees and expenses paid by the plan may substantially reduce retirement income. Fees and expenses are thus a significant factor that affect plan participant's investment returns and impact their retirement income.

35.     Employers must consider the fees and expenses paid by a plan. Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.

36.     Employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided; and (3) monitor investment options and service providers once selected to make sure they continue to be appropriate choices.

**Recordkeeping Services**

37.     Defined contribution plan fiduciaries of large 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of retirement plans. Merrill Lynch is one such recordkeeper.

38.     These recordkeepers deliver all the essential recordkeeping and related administrative ("RK&A") services through standard bundled offerings of the same level and quality.

39.     There are two types of essential RK&A services provided by all recordkeepers. For large plans with substantial bargaining power (like the Plan), the first type, "Bundled RK&A," is provided as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided in retirement industry parlance on an "all-you-can-eat" basis). The Bundled RK&A services include, but are not limited

to, the following standard services:

a. Recordkeeping;

b. Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c. Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d. Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e. Maintenance of an employer stock fund (if needed);

f. Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g. Plan consulting services including assistance in selecting the investments offered to participants;

h. Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

i. Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

j. Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

40.     The second type of essential RK&A services, hereafter referred to as "Ad Hoc RK&A" services, provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees). These "Ad Hoc RK&A" services typically include, but are not limited to, the following:

a. Loan processing;
b. Brokerage services/account maintenance;
c. Distribution services; and
d. Processing of Qualified Domestic Relations Orders (QDROs).

41.     For mega plans, like the Kroger Plan, any minor variations in the level and quality of RK&A services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers.

42.     All recordkeepers quote fees for the Bundled RK&A services on a per participant basis without regard for any individual differences in services requested -- which are treated by the recordkeepers as immaterial because they are, in fact, inconsequential from a cost perspective to the delivery of the Bundled RK&A services.

43.     The vast majority of fees earned by recordkeepers typically come from the bundled fee for providing the Bundled RK&A services as opposed to the Ad Hoc RK&A services.

44.     The Kroger Plan is the largest plan in the Kroger Defined Contribution Master Trust ("Master Trust.") The Master Trust, and the Plan by extension, had a standard package of Bundled RK&A services, providing recordkeeping and administrative services of a nearly identical level and quality to other recordkeepers who also service mega plans.

45.     By disclosing service codes 15 in Schedule C of its 2020 Master Trust 5500 form, the Plan indicates that the only service provided by Merrill Lynch was recordkeeping.[1] This makes clear that Merrill Lynch is not providing anything other than the standard package of RK&A Services that all Plan their size would receive and with the same level and quality of services provided by most mega-plan record-keepers.

---

[1] Service Code 15 is defined in the Instructions for Schedule C of Form 5500 defines Service Code 15 as "Record-keeping and information management (computing, tabulating, data processing, etc.)."

46.     Because recordkeepers offer the same bundles and combinations of ser-vices as their competitors, the market for defined contribution retirement plan ser-vices has become increasingly price competitive for plans that have a sizable number of participants.

47.     Over the past twenty years, the fees that recordkeepers have been will-ing to accept for providing retirement plan services has significantly decreased. Recordkeepers are willing (or competitively required) to accept a lower and more com-petitive fee as a result of, among other things, the competitive pressures created by greater information becoming available to plan fiduciaries and the reduction in opaque fee structures.

48.     By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing RK&A has stabilized, and has not materially changed for large plans, including the Plan. In other words, reasonable recordkeeping fees paid in 2019 are representative of the reasonable fees during the entire Class Period.

49.     The underlying cost to a recordkeeper of providing recordkeeping to a defined contribution plan is primarily dependent on the number of participant ac-counts in the Plan rather than the amount of assets in the Plan.  As a plan gains more participants, the reasonable market rate for the services provided by the record-keeper will decline.

50.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the

recordkeepers on behalf of the investment manager.

51.     As a result, recordkeepers often make separate contractual arrangements with mutual fund providers. For example, recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

52.     Recordkeepers typically collect their fees through direct payments from the Plan or through indirect compensation such as revenue sharing, or some combination of both.

53.     Regardless of the pricing structure that the plan fiduciary negotiates with any service provider, and Plaintiff expresses no preference, the amount of compensation paid to service providers, including the recordkeepers, must be reasonable.

54.     As a result, plan fiduciaries must understand the total dollar amounts paid to the recordkeeper and be able to determine whether the compensation is objectively reasonable by understanding the market for such recordkeeping services.

## THE PLAN

55.     During the entire Class Period, the Plan received recordkeeping services from Merrill Lynch.

56.     At all relevant times, the Plan's recordkeeping fees were objectively unreasonable and excessive when compared with other comparable 401(k) plans offered by other sponsors that had similar numbers of plan participants.

57.     The fees were also excessive relative to the level and quality of recordkeeping services received since the same level and quality of services are generally

offered to mega plans, like the Kroger Plan, regardless of the number of services selected by the Plan and regardless of the specific service codes utilized by the plan on the Form 5500. In this case, however, as noted above, it is clear that Merrill Lynch did not provide any services that were not part of the standard package of RK&A services provided by all recordkeepers to all mega plans.

58. These excessive Plan recordkeeping fees led to lower net returns than participants in comparable 401(k) Plans enjoyed.

59. During the Class Period, Defendants breached their duty of prudence owed to the Plan, to Plaintiff and all other Plan Participants, by authorizing the Plan to pay objectively unreasonable fees for recordkeeping services.

60. Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan participants and their beneficiaries, breached their fiduciary duties of prudence in violation of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiff and members of the Class millions of dollars of harm to their Plan accounts.

<u>STANDARD OF CARE FOR PRUDENT FIDUCIARIES</u>
<u>SELECTING & MONITORING RECORDKEEPERS</u>

61. A plan fiduciary is required to fully understand all sources of revenue received by its recordkeeper. It must regularly monitor that revenue to ensure that the compensation received is, and remains, reasonable for the quality and level of services provided.

62. Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," *see Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same

level and quality of services currently being provided to the Plan.

63. Prudent plan fiduciaries can easily receive a quote from other record-keepers to determine if their current level of recordkeeping fees in light of the level and quality of recordkeeper fees is reasonable.

64. Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee and move to a new recordkeeper to provide the same (or better) level and qualities of services for a more competitive reasonable fee if necessary.

65. A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated recordkeeping fees. To receive a truly "reasonable" recordkeeping fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

66. Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.,* 746 F.3d 327, 336 (8th Cir. 2014).

67. First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

68. Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided

to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

69. Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

70. Accordingly, the only way to determine the reasonable, as opposed to the cheapest or average, market price for a given quality and level of recordkeeping services is to obtain competitive bids from other providers in the market.

### PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR RECORDKEEPING FEES AND THE PLAN THUS PAID UNREASONABLE RECORDKEEPING FEES

71. A plan fiduciary must continuously monitor its recordkeeping fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

72. During the Class Period, Defendants failed to regularly monitor the Plan's recordkeeping fees paid to recordkeepers, including but not limited to Merrill Lynch.

73. During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Merrill Lynch, in order to avoid paying unreasonable recordkeeping fees.

74. During the Class Period, and unlike a hypothetical prudent fiduciary,

Defendants followed a fiduciary process that was done ineffectively given the objectively unreasonable recordkeeping fees it paid to Merrill Lynch given the level and quality of recordkeeper services it received.

75. From the years 2015 through 2020, the table below shows the actual *Bundled RK&A fee rate* the Plan fiduciaries claim to have agreed to with Merrill Lynch, along with the year-end participants and total annual Bundled RK&A fees.

**The Plan's Bundled RK&A Fees**

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | *Average* |
|---|---|---|---|---|---|---|---|
| Participants | 83,482 | 79,408 | 89,943 | 90,005 | 92,210 | 96,550 | *88,600* |
| Bundled RK&A Fees | $2,671,424 | $2,541,056 | $2,878,176 | $2,880,160 | $2,950,720 | $3,089,600 | *$2,835,189* |
| Bundled RK&A Fee Per Participant[1] | $32 | $32 | $32 | $32 | $32 | $32 | *$32* |

[1] *Mercer Fee Allocation Current Fee Structure slide*, p. 40 (attached hereto as Exhibit 1). The documents produced by Defendants state that Merrill Lynch also earned an undisclosed amount of indirect compensation paid by participants for recordkeeping services that is *in addition to* the amounts set forth above.

**Comparable Plans' Bundled RK&A Fees Based on Public Information from Form 5500[1]**

| Plan | Participants | Assets | RK&A Fee | RK&A Fee /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $3,104,524,321 | $1,298,775 | $27 | Vanguard | White |
| Sutter Health 403(B) Savings Plan | 73,408 | $3,681,162,013 | $1,908,133 | $26 | Fidelity | White |
| Marriott International, Inc. Employees' Profit Sharing Retirement And Savings Plan And Trust | 115,501 | $7,660,619,525 | $2,636,322 | $23 | Alight | White |
| Apple 401(K) Plan | 115,686 | $7,400,046,748 | $2,114,871 | $18 | Great-West | White |

[1] RK&A calculations are based on 2018 Form 5500 and publicly available revenue sharing information.

76.     These comparable plans provide a good indication of the fair market per participant Bundled RK&A fee rate for the same level and quality of services provided to the Plan (since the Plan did not receive any extra or unusual services in addition to the standard set of services described above).

77.     It is also important to note that the total RK&A Fee rates (which is comprised of the sum of the Bundled RK&A fees plus the Ad Hoc RK&A Fees) of the comparable plans above works out to be *lower than* the Plan's Bundled RK&A fee rate, which does not even include the Plan's Ad Hoc RK&A Fees.

78.     The Bundled RK&A Fee rate negotiated by each of the comparable plans above is therefore lower than the total RK&A Fee rate set forth in the table above and is also much lower than the Bundled RK&A Fee rate of $32 per participant agreed to by the Plan Fiduciaries.

79.     These figures strongly support an inference of a flawed fiduciary process and imprudent decision-making by the Plan fiduciaries.

80.     Specifically, from the years 2015 through 2020, the graph below illustrates the annual effective *total* RK&A fees (Bundles + Ad Hoc) paid by the comparable plans identified above with the white data points representing the total effective per participant RK&A fee rate several other recordkeepers offered to and accepted from comparably-sized mega Plans.



81.     As illustrated in the graph above, the Bundled RK&A Fee Rate of $32 per participant agreed to by the Plan Fiduciaries *is greater than* the total RK&A fee rate (Bundled RK&A + Ad Hoc RK&A) of these comparable plans that received the same, or greater, quality and level of services.

82.     There are also publicly available Bundled RK&A fee rates provided by other mega-plan recordkeepers that support an inference that the Plan fiduciaries did not follow an objectively reason process when negotiating the Bundled RK&A Fee rate with Merrill Lynch.

83.     For example, Fidelity is considered by many to be one of the premier recordkeepers in the retirement plan industry.  Fidelity has provided in a stipulation of fact in another ERISA fee case that had its own Fidelity 401(k) plan for Fidelity employees "negotiate[ ] a fixed fee for recordkeeping services [the Bundled RK&A Fee rate] at arm's length with Fidelity,  it could have obtained recordkeeping services for

[specified] amounts during these periods [from 2014 through 2020]." Those specified amounts are set forth below. *See* Stipulations of Fact, *Moitoso, et al. v. FMR LLC, et al.*, 1:18-CV-12122-WGY, ECF No. 138-67, at p. 3 (D. Mass.)

| Year | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Participants | 51,049 | 56,627 | 57,658 | 57,312 | 58,163 | 60,681 | 64,113 |
| Fair Market Bundled RK&A Fee rate for Bundled RK&A Services provided by Fidelity | $21 | $17 | $17 | $14 | $14 | $14 | $14 |

84. In other words, Fidelity acknowledged that the fair market rate for its Bundled RK&A services for plans with greater than $1B in assets, like the Kroger Plan, ranged from $21 per participant when the plan had 51,049 participants, down to $14 per participant when the plan had increased to 57,312 participants.

85. Similarly, as evidenced by its 404(a) Fee Disclosure document attached hereto as Exhibit 2, the Lowe's 401(k) Plan paid a Bundled RK&A Fee rate of $18.50 per participant for the full suite of standard Bundled RK&A services, with the same level and quality of services that the Kroger Plan received during the Class Period.

86. The table below compares the Kroger Plan's Bundled RK&A Fee rate with the comparable Lowe's 401(k) Plan's Bundled RK&A fee rates and the Fidelity Retirement Savings Plan's Bundled RK&A fee rates.

Comparable Mega Plan Bundled RK&A Fee Rates

| Plan | Partici-pants | Assets | Bundled RK&A Fee | Bun-dled RK&A Fee/pp | Record-keeper | Graph Color |
|---|---|---|---|---|---|---|
| Fidelity Retirement Savings Plan 2014[1] | 51,049 | $13,250,740,623 | $1,072,029 | $21 | Fidelity | Blue |
| Fidelity Retirement Savings Plan 2015[1] | 56,627 | $13,599,102,611 | $962,659 | $17 | Fidelity | Blue |
| Fidelity Retirement Savings Plan 2016[1] | 57,658 | $14,730,835,962 | $980,186 | $17 | Fidelity | Blue |
| Fidelity Retirement Savings Plan 2017[1] | 57,312 | $17,265,509,336 | $802,368 | $14 | Fidelity | Blue |
| Fidelity Retirement Savings Plan 2018[1] | 58,163 | $16,119,398,751 | $814,282 | $14 | Fidelity | Blue |
| Fidelity Retirement Savings Plan 2019[1] | 60,681 | $20,317,547,857 | $849,534 | $14 | Fidelity | Blue |
| Fidelity Retirement Savings Plan 2020[1] | 64,113 | $24,332,734,660 | $897,582 | $14 | Fidelity | Blue |
| Kroger Plan Bun-dled RK&A Fee Rate | 88,600 | $5,175,864,667 | $2,835,189 | $32 | Merrill Lynch | Red |
| Lowes 401(K) Plan[2] | 154,402 | $5,619,838,861 | $2,856,437 | $19 | Wells Fargo | Blue |

[1]Stipulation of Fact, *Moitoso, et al., v FMR LLC, et al.*, Case 1:18-cv-12122-WGY, ECF No. 138-67, at p. 3 (D. Mass.)
[2]Lowe's 401(k) Plan 404a-5 participant fee disclosure (Exhibit 2)

90.    The graph below illustrates each of the Bundled RK&A Fee rates for these similar-sized mega plans, i.e., Fidelity and Lowes, and compares those Bundled RK&A Fee rates with the Bundled RK&A Fee rate of $32 agreed to by the Kroger Plan fiduciaries.



91.    The disparity between the Kroger Bundled RK&A Fee rate of $32 and the fair market Bundled Fee Rate stipulated by Fidelity, as well as the Bundled RK&A Fee rate paid by the Lowe's 401(k) Plan, supports a strong inference of a flawed fiduciary process and imprudent decision-making on the part of the Kroger Plan fiduciaries.

92.    Combining (1) the disparity between the Kroger Plan's Bundled RK&A Fee rate of $32 per participant and the Bundled RK&A Fee rates of other comparable plans, with (2) the disparity between the Plan's Bundled RK&A Fee rate of $32 and the lower total RK&A Fee rate paid by comparable plans set forth above in paragraphs 75-80, strongly supports an inference of a flawed fiduciary process and imprudent decision-making on the part of the Plan fiduciaries.

93.    The difference between the Plan's Bundled RK&A Fee rate of $32 and

a reasonable Bundled RK&A Fee rate of around $17 per participant result in compounded losses of over $12 million dollars.

94. Even if the Plan's participants paid only $5 per year per participant in unreasonable and excessive RK&A Fees, that amounts to an average of $442,998 in excessive and unreasonable RK&A Fees per year for the six years of the Class Period, or $2,657,990 dollars in losses. When compounded using an investible proxy for the S&P 500 returns (VIIIX), Defendants' have suffered losses of $3,965,531 dollars in excessive recordkeeping fees through 2020, as set forth in the table below.

### Hypothetical Minimum Losses

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| Participants | 83,482 | 79,408 | 89,943 | 90,005 | 92,210 | 96,550 |
| Hypothetical Minimum Losses per Participant | $5 | $5 | $5 | $5 | $5 | $5 |
| Hypothetical Minimum Losses | $417,410 | $397,040 | $449,715 | $450,025 | $461,050 | $482,750 |
| Compounding Percentage (VIIIX) | | 11.95% | 21.82% | -4.41% | 31.48% | 18.41% |
| Est. Conservative Cumulative Hypothetical Minimum Losses | $417,410 | $864,330 | $1,502,642 | $1,886,401 | $2,941,290 | **$3,965,531** |

95. The estimated losses calculated above are conservative in that they do not even account for the objectively unreasonable and excessive RK&A fees paid by Plan participants through undisclosed amounts of indirect compensation.

96. A hypothetical prudent plan fiduciary would not agree to pay over $4 million dollars more in additional recordkeeping fees that could have instead been paid by a combination of negotiating a reasonable fee with Merrill Lynch and

continuing to have the employer subsidize the recordkeeping fee at the current levels.

97.     Plaintiff paid these excessive recordkeeping fees in the form of fee extractions from her account and appears to have also paid undisclosed indirect compensation to Merrill Lynch for recordkeeping services, and thus, suffered injuries to her individual Plan account.

98.     The Plan itself paid both direct and indirect compensation to Merrill Lynch in excess of the amounts extracted directly from Plaintiff's account. Merrill Lynch also received indirect compensation for recordkeeping services in the form of "Other investment fees and expenses" (under compensation code 72) on the Master Trust Form 5500.

99.     This means the Plan *paid Merrill Lynch indirect compensation for recordkeeping services*. This indirect compensation amount is not disclosed to Plan participants and is *in addition* to the direct compensation paid through fee extractions from participant accounts.

100.    So, in other words, Plaintiff paid excessive fees both as direct compensation through fee extractions, as well as through undisclosed indirect compensation, that was used to compensate Merrill Lynch for recordkeeping services.

101.    During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not regularly and/or reasonably assess in an objective manner the Plan's direct and indirect recordkeeping fees it paid to Merrill Lynch.

102.    During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or objectively

reasonable examination and competitive comparison of the recordkeeping fees it paid to Merrill Lynch vis-à-vis the fees that other recordkeeping providers would charge, and would have accepted, for the same quality and level of RK&A Bundled services or total RK&A services.

103. During the entirety of the Class Period and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the record-keeping fees it paid to Merrill Lynch, it would have realized and understood that the Plan was compensating Merrill Lynch unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and Plan Participants, and would have removed Merrill Lynch as an imprudent choice.

104. The Plan recordkeeping fees were also excessive relative to the record-keeping services received, since the quality and level of such services are standard for mega 401(k) plans like this Plan and are provided on an "all-you-can-eat-basis," based on primarily on the number of participants a plan has. In other words, any difference in recordkeeping fees between comparable Plans is not explained by the level and quality of services each recordkeeper provides.

105. During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged unreasonable recordkeeping fees than they should have been, and by failing to take effective remedial actions including removing Merrill Lynch as Plan recordkeeper, Defendants breached their fiduciary duty of prudence to Plaintiff and Plan participants.

## CLASS ACTION ALLEGATIONS

106.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

107.    In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of The Kroger Co. 401(k) Retirement Savings Account Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning November 5, 2015 and running through the date of judgment.

108.    The Class includes over 90,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

109.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

- Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether Defendants breached their fiduciary duties to the Plan;

- What are the losses to the Plan resulting from each breach of fiduciary duty; and

- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

110.    Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a Participant during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

111.    Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because she is a Participant in the Plan during the Class period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

112.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

113.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief

is appropriate respecting the class as a whole.

114. Plaintiff's attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

115. The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

116. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

117. Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

118. Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

## FIRST CLAIM FOR RELIEF
### Breach of Duty of Prudence of ERISA, as Amended
### (Against All Defendants – Recordkeeping Fees)

119. Plaintiff restates the above allegations as if fully set forth herein.

120.     Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

121.     29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendants in their administration of the Plan.

122.     Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges objectively reasonable recordkeeping fees.

123.     During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's recordkeeping fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

124.     During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's recordkeeping fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

125.     During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the RK&A services at reasonable costs, given the highly competitive market surrounding recordkeeping and the significant bargaining power the Plan had to negotiate the best fees, and remove the recordkeeper if it provided recordkeeping services at objectively unreasonable costs.

126.     During the Class Period, Defendants breached their duty to Plan

participants, including Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeeper critically or objectively in comparison to other recordkeeper options.

127. Through these actions and omissions, Defendants breached their fiduciary duty of prudence with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(B).

128. Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

129. As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

130. Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Kroger Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief as set forth in the Prayer for Relief.

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Against All Defendants – Recordkeeping Fees)**

131. Plaintiff restates the above allegations as if fully set forth herein.

132.    Defendants had the authority to appoint and remove members or individuals responsible for Plan recordkeeping fees, and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

133.    In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan recordkeeping fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

134.    Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

135.    The objectively unreasonable and excessive recordkeeping fees paid by the Plan inferentially suggest that Kroger and the Board breached their duty to monitor by, among other things:

    a.  Failing to monitor and evaluate the performance of individuals responsible for Plan recordkeeping fees and fee disclosures or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably recordkeeping expenses;

b. Failing to monitor the process by which the Plan's recordkeeper was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

c. Failing to remove individuals responsible for Plan recordkeeping fees and fee disclosure whose performance was inadequate in that these individuals continued to pay the same recordkeeping costs even though solicitation of competitive bids would have shown that maintaining Merrill Lynch as the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

136. As the consequences of the foregoing breaches of the duty to monitor for recordkeeping fees the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

137. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Kroger Plan all loses caused by their failure to adequately monitor individuals responsible for Plan recordkeeping fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.   A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.   Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.     A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable recordkeeping costs, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligation;

E.     An Order requiring Defendant Kroger to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Kroger as necessary to effectuate relief, and to prevent Kroger's unjust enrichment;

F.     An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.     An award of pre-judgment interest;

I.     An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.     Such other and further relief as the Court deems equitable and just.

Dated this 11th day of March, 2022

> s/  Paul M. Secunda_____
> James A. Walcheske, State Bar No. 1065635
> Scott S. Luzi, State Bar No. 1067405
> Paul M. Secunda, State Bar No. 1074127
> **WALCHESKE & LUZI, LLC**
> 235 Executive Dr., Suite 240
> Brookfield, Wisconsin 53005
> Telephone: (262) 780-1953
> E-Mail: jwalcheske@walcheskeluzi.com

E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com

Robert R. Sparks, State Bar No.
**STRAUSS TROY**
Federal Reserve Building
150 E. 4th Street, 4th Floor
Cincinnati, OH 45202-4018
Telephone: (513) 621-2120
Email: rrsparks@strausstroy.com

Counsel for Plaintif