# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| LISA SIGETICH, *individually, and as* | : | Case No. 1:21-cv-697 |
| *representative of a Class of Participants* | : | |
| *and Beneficiaries of The Kroger Co.* | : | Judge Timothy S. Black |
| *401(k) Retirement Savings Account Plan*, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| THE KROGER CO., *et al.*, | : | |
| | : | |
| Defendants. | : | |

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

This civil case is before the Court on Defendants' motion to dismiss (Doc. 40) and the parties' responsive memoranda (Docs. 42, 44). Also before the Court are two notices of supplemental authority (Docs. 46, 49) and the brief of *amicus curiae* Chamber of Commerce of the United States of America (Doc. 48).

## I. ERISA BACKGROUND

This case concerns fees associated with administering a retirement plan under the Employment Retirement Income Security Act of 1974, otherwise known as ERISA. Some initial background on retirement plans and ERISA is helpful.

"Enacted in 1974, ERISA protects participants in employee benefit plans, including retirement plans, by establishing standards of conduct for plan fiduciaries." *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1164 (6th Cir. 2022) (citing 29 U.S.C. § 1001(b)). "The law requires that a plan administrator discharge his duties "with the

care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" *Id.* (quoting 29 U.S.C. § 1104(a)(1)(B)). "The obligation includes 'a continuing duty to monitor trust investments and remove imprudent ones.'" *Id.* (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015)).

A defined contribution plan is one type of retirement plan. "Defined-contribution plans allow employees to save for retirement, often through a tax-advantaged account like a 401(k) plan, sometimes with matching contributions from their employers." *Forman v. TriHealth, Inc.*, 40 F.4th 443, 446 (6th Cir. 2022) (citing John Downes & Jordan Elliot Goodman, *Barron's Dictionary of Finance and Investment Terms* 168 (6th ed. 2003)). "Employees choose how to invest their accounts from a menu of investment options offered by the plans." *Id.* "The initial contributions and any growth or decline over time (minus fees charged) determine the eventual post-retirement payouts from these accounts—along with any interest and dividends generated by the investments." *Id.*

One type of fee associated with retirement plans are fees for services provided by recordkeepers. "Recordkeepers help plans track the balances of individual accounts, provide regular account statements, and offer informational and accessibility services to participants." *Hughes v. Nw. Univ.*, 211 L. Ed. 2d 558, 142 S. Ct. 737, 740 (2022). The two primary methods for retirement plans to pay for recordkeeping services are through indirect revenue sharing or by direct payment. Stated differently, "recordkeeping fees

may be calculated as a percentage of the assets for which the recordkeeper is responsible; alternatively, these fees may be charged at a flat rate per participant account." *Id*.

Recordkeeping fees impact the amount of money a participant will have saved for retirement. *Id*.; *Forman*, 40 F.4th 446. Thus, when selecting a recordkeeper, plan fiduciaries must do so "with the care, skill, prudence, and diligence under the circumstances then prevailing." 29 U.S.C. § 1104(a)(1)(B). An excessive recordkeeping fee may plausibly state a duty of prudence claim if the recordkeeping fees were excessive relative to the services rendered. *CommonSpirit*, 37 F.4th at 1169 (*Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (per curiam)).

## II.    FACTS <u>AS ALLEGED</u> BY PLAINTIFF

### A.    The Parties

Plaintiff Lisa Sigetich was a Customer Service Representative at Kroger in Wisconsin and is currently on disability leave. (Doc. 32 at ¶ 17). She has been a participant in The Kroger Co. 401(k) Retirement Savings Accounts Plan (the "Kroger Plan"), since November 5, 2015. (*Id.* at ¶¶ 5, 16). Defendant The Kroger Co. ("Kroger") acted through its officers, including the Defendants, the Board of Directors of Kroger and other appointed fiduciaries, to perform Kroger Plan-related fiduciary functions (collectively, "Defendants"). (*Id.* at ¶ 23). Kroger is both the Kroger Plan sponsor and administrator. (*Id.* at ¶ 24). Defendants are fiduciaries of the Kroger Plan.

### B.    The Kroger Plan

The Kroger Plan is a 401(k) defined contribution plan. (Doc. 32 at ¶ 4). The Kroger Plan is considered a "mega" 401(k) plan, having over $500 million in assets. (*Id.*

at ¶ 21). The Kroger Plan is the largest plan in the Kroger Defined Contribution Master Trust. (*Id.* at ¶ 44). In 2019, the Kroger Plan had about $5,901,895,000 in assets and 92,210 participants. (*Id.* at ¶ 29). At that time, the Kroger Plan had more assets than 99.98%, and more participants than 99.99%, of all defined contribution plans in the United States that filed Form 5500's for the 2019 plan year. (*Id.*)

### C. Recordkeeping Services for ERISA Plans

Fiduciaries of large 401(k) plans hire service providers, generically referred to as "recordkeepers," to deliver a retirement plan benefit to employees. (Doc. 32 at ¶ 37). Recordkeepers provide all essential recordkeeping and related administrative ("RK&A") services through standard bundled offerings of the same level and quality. (*Id.* at ¶ 38). There are two types of "essential" recordkeeping services: "Bundled RK&A" and "Ad hoc RK&A." (*Id.* at ¶ 39-40).

For large plans with substantial bargaining power (like the Kroger Plan), Bundled RK&A services are provided "buffet-style," meaning these services are charged on an "all-you-can-eat" basis. (*Id.* at ¶ 39). Bundled RK&A services typically include, but are not limited to, the following standard services:

    a. Recordkeeping;

    b. Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

    c. Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

    d. Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

    e. Maintenance of an employer stock fund (if needed);

    f. Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

    g. Plan consulting services including assistance in selecting the investments offered to participants;

    h. Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

    i. Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

    j. Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

(*Id.*).

"Ad Hoc RK&A" services are provided based on the conduct of individual participants, and charged based on usage. (*Id.* at ¶ 40). Ad Hoc RK&A services typically include, but are not limited to, the following services:

    a. Loan processing;

    b. Brokerage services/account maintenance;

    c. Distribution services; and

    d. Processing of Qualified Domestic Relations Orders (QDROs).

(*Id.*).

Recordkeepers quote fees for Bundled RK&A services on a per participant basis, without any regard for any individual differences in services requested. (*Id*. at ¶ 42). According to Plaintiff, recordkeepers quote fees without any regard to differences in services requested because minor variations in the level and quality of services are inconsequential and immaterial. (*Id.* at ¶¶ 41-42.) Most fees earned by recordkeepers typically come from the bundled fee for providing Bundled RK&A services. (*Id*. at ¶ 43).

Because recordkeepers offer the same bundles and combinations of services, the market for recordkeeping services has become increasingly price competitive, particularly for large defined contribution plans. (*Id.* at ¶ 46). Recordkeepers are willing, and competitively required, to accept lower and more competitive fees because of competitive pressures created by publicly available information and the reduction of opaque fee structures. (*Id.* at ¶ 47).

A recordkeeper's costs are primarily dependent on the number of participants. (*Id.* at ¶ 49). As a plan gains more participants, the reasonable market rate for RK&A services declines. (*Id*.) Recordkeepers collect their fees through: (1) direct payments from the plan; (2) "indirect compensation," also known as "revenue sharing;" or (3) some combination of direct and indirect compensation. (*Id.* at ¶¶ 50-52).

Regardless of how a recordkeeper is compensated, prudent plan fiduciaries must ensure that a plan is paying reasonable recordkeeping fees. (*Id*. at ¶ 53). According to Plaintiff, prudent plan fiduciaries ensure reasonable fees by engaging in an independent evaluation and soliciting competitive bids from other recordkeepers to perform the same

level and quality of services.  (*Id*. at ¶ 62).  By obtaining competitive bids, prudent plan fiduciaries may evaluate the reasonableness of current fees, negotiate a lower fee (if needed), or move to a new recordkeeper (if needed).  (*Id*. at ¶ 64-70).

### D.    The Kroger Plan's Recordkeeper and RK&A Services

From 2015 through 2020, the Kroger Plan used Bank of America, N.A. and Merrill Lynch (collectively, "Merrill Lynch") as a recordkeeper.  (Doc. 32 at ¶¶ 5, 55). Merrill Lynch provided a standard package of Bundled RK&A services, and did not provide any services that were not part of a standard package of RK&A services.  (*Id*. at ¶¶ 44-45, 57).   From 2015 through 2020, the Kroger Plan had an average of 88,600 participants and paid $2,835,185 in Bundled RK&A services to Merrill Lynch, resulting in a $32 per participant recordkeeping fee.  (*Id*. at ¶ 75).  During each year, the per participant fee was split between each participant and Kroger.  Kroger covered $27 of each participant fee, while participants covered $5 each.  (Doc. 32-1).

According to Plaintiff, the Kroger Plan paid excessive fees when compared to other 401(k) plans with a similar number of participants.  (Doc. 32 at ¶¶ 56-57).  Plaintiff then provides the information about comparable plans' Bundled RK&A fees, which information is based on publicly available information from 2018 Form 5500s:[1]

---

[1] Plaintiff uses the average amounts from 2015 through 2020 for the Kroger Plan.  Plaintiff then uses only the year 2018 for her comparable plans.  For consistency, the Court uses information from 2018 for the Kroger Plan.

| Plan | Partici-pants | Assets | RK&A Fee | RK&A Fee/pp | Record-keeper |
|---|---|---|---|---|---|
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $3,104,524,321 | $1,298,775 | $27 | Vanguard |
| Sutter Health 403(B) Savings Plan | 73,408 | $3,681,162,013 | $1,908,133 | $26 | Fidelity |
| **Kroger Plan** | **90,005** | **$4,891,968,000** | **$2,880,160** | **$32** | **Merrill Lynch** |
| Marriot International, Inc. | 115,501 | $7,760,619,525 | $2,636,322 | $23 | Alight |
| Apple 401(K) Plan | 115,686 | $7,400,046,748 | $2,114,871 | $18 | GreatWest |
| Lowes 401(K) Plan | 154,402 | $5,619,838,861 | $2,856,437 | $19 | Wells Fargo |

(*Id.* at ¶¶ 75, 86).[2]  Based on the comparable plans, Plaintiff contends that the Kroger

Plan's per participant recordkeeping fee was excessive, suggesting a flawed and

imprudent fiduciary process.  (*Id.* at ¶¶ 78-79, 92).

---

[2] "The U.S. Department of Labor, Internal Revenue Service, and the Pension Benefit Guaranty Corporation jointly developed the Form 5500 Series so employee benefit plans could utilize the Form 5500 Series forms to satisfy annual reporting requirements under Title I and Title IV of ERISA and under the Internal Revenue Code." *See* https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500 (last visited Feb. 21, 2023).  Although Plaintiff relies on Form 5500's, she does not attach any to her Amended Complaint.  (Doc. 32 at ¶¶ 45, 75)  However, "[a] court may consider certain materials outside of the pleadings without converting the motion to one for summary judgment." *Father Flanagan's Boys Home v. Donlon*, 449 F. Supp. 3d 739, 746 (S.D. Ohio 2020).  "These materials include, 'exhibits attached [to the complaint], public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein.'" *Id.* (quoting *Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011)) (alteration and emphasis in original).  Because the Form 5500's are referred to in the Amended Complaint and are public records, the Court may consider the Form 5500's when resolving the motion to dismiss.

### E. Present Lawsuit

Plaintiff seeks to bring claims individually and on behalf of the following

proposed class:

> All participants and beneficiaries of The Kroger Co. 401(k)
> Retirement Savings Account Plan (excluding the Defendants
> or any participant/beneficiary who is a fiduciary to the Plan)
> beginning November 5, 2015 and running through the date of
> judgment.

(Doc. 32 at ¶ 107).  Plaintiff asserts two claims under ERISA: (1) breach of the duty of

prudence related to recordkeeping fees against Defendants; and (2) failure to adequately

monitor other fiduciaries related to recordkeeping fees against Defendants.  (*Id.* at

¶¶ 119-130, 131-137).  Defendants move to dismiss the entire Amended Complaint for

lack of standing and for failure to state a claim.  (Doc. 40).

### III. STANDARD OF REVIEW

### A. Fed. R. Civ. P. 12(b)(1)

On a 12(b)(1) motion, the plaintiff has the burden of proving jurisdiction.  *Moir v.*

*Greater Cleveland Regional Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).  "A court

lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the

proceedings in which it becomes apparent that jurisdiction is lacking."  *Morgan v. United*

*States Dep't of Educ.*, 596 F. Supp. 3d 1023, 1026 (S.D. Ohio 2022) (quotation omitted).

Motions to dismiss for lack of subject-matter jurisdiction fall into two general categories:

facial attacks and factual attacks.  *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir.

1994).  In a factual attack, the Court must weigh the "evidence [before it] to arrive at the

factual predicate that subject matter jurisdiction exists or does not exist."  *Ohio Nat'l Life*

*Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).  A facial attack goes to whether the plaintiff has properly alleged a basis for jurisdiction, and the trial court takes the allegations of the complaint as true.  *Id.*  When arguing Plaintiff lacks standing, Defendants do not contest the facts in the complaint and therefore bring a facial attack. *Ball by Burba v. Kasich*, 244 F. Supp. 3d 662, 672 (S.D. Ohio 2017).  In deciding the merits of a facial attack under 12(b)(1), "the court must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).  Thus, a facial attack on the pleading under Rule 12(b)(1) mirrors the standard of review on a motion brought under Rule 12(b)(6).  *Ball by Burba*, 244 F. Supp. 3d at 672.

### B.      Fed. R. Civ. P. 12(b)(6)

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted."  To show grounds for relief, Fed. R. Civ. P. 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' ... it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (citing *Twombly*, 550 U.S. at 555). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a

legal conclusion couched as a factual allegation[.]'" *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265 (1986) ). Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.*

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. A claim is plausible where a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the case shall be dismissed. *Id.* (citing Fed. Rule Civ. P. 8(a)(2)).

## IV. ANALYSIS

### A. Plaintiff plausibly alleges standing.

"[T]here are two components to any given standing inquiry: constitutional and statutory." *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 581 (6th Cir. 2016). For the statutory inquiry, the "question is whether the particular plaintiff has a cause of action under the statute." *Id*. (quotation omitted). ERISA creates a right of action for participants, beneficiaries, and fiduciaries of benefit plans. *See* 29 U.S.C. § 1332(a). And, at this stage, Defendants do not challenge whether Plaintiff has statutory standing. Instead, the current standing inquiry rests on whether Plaintiff has Article III standing.

"Article III standing enforces the Constitution's case-or-controversy requirement."
*Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007).  The
standing doctrine ensures that a plaintiff in federal court has "such a personal stake in the
outcome of the controversy as to warrant his invocation of federal-court jurisdiction."
*Warth v. Seldin*, 422 U.S. 490, 498 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204
(1962)) (quotation marks omitted); *see also O'Shea v. Littleton*, 414 U.S. 488, 494
(1974).  "To satisfy Article III's standing requirements, a plaintiff must show: (1) [she]
has suffered an injury in fact that is (a) concrete and particularized and (b) actual or
imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the
challenged action of the defendant; and (3) it is likely, as opposed to merely speculative,
that the injury will be redressed by a favorable decision."  *Loren*, 505 F.3d at 607
(quotation omitted).

A plaintiff, as the party invoking federal jurisdiction, bears the burden of
establishing standing.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130,
2137, 119 L. Ed. 2d 351 (1992).  "A plaintiff must demonstrate standing 'with the
manner and degree of evidence required at the successive stages of the litigation.'"
*TransUnion LLC v. Ramirez*, 210 L. Ed. 2d 568, 141 S. Ct. 2190, 2208 (2021) (quoting
*Lujan*, 504 U.S. at 561 (1992)).  A Plaintiff suing on behalf of a respective ERISA plan
must still establish individual standing.  *Loren*, 505 F.3d 598 at 608 (citations omitted).
If a plaintiff lacks Article III standing, the court lacks subject matter jurisdiction to hear
the case.  *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 386 (6th Cir.
2020).

### 1. *Injury-in-Fact*

Defendants' primary argument is that Plaintiff fails to allege an injury-in-fact. Specifically, Defendants argue that Plaintiff has not suffered any injury-in-fact because Plaintiff only paid $5 in recordkeeping fees.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo v. Robins*, 578 U.S. 330, 339 (2016) (citing *Lujan*, 504 U.S. at 560). "For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way." *Id.* (quotation and citations omitted). "A "concrete" injury must be "*de facto*"; that is, it must actually exist." *Id.* (citing BLACK'S LAW DICTIONARY (9th ed. 2009)).

Plaintiff alleges that a reasonable recordkeeping fee for the relevant time period would have been $17 per participant, that Defendants bargained for an unreasonable fee of $32 per participant, and that Kroger and Plaintiff split the cost of the recordkeeping fee—$27 paid by Kroger and $5 paid by Plaintiff. (Doc. 32 at ¶ 17; Doc. 32-1). Defendants argue that this fails to allege an injury-in-fact because Plaintiff did not, in fact, pay an unreasonable fee, since Plaintiff only paid $5. (Doc. 40-1 at 7-9). Defendants also contend that any argument that Kroger would have covered the entire fee, meaning Plaintiff would have paid $0 had Defendants negotiated a reasonable fee, is hypothetical. (*Id.* at 9-11).

Defendants' theory is one plausible inference. However, as Plaintiff argues, another plausible inference is that, because Kroger agreed to pay, and did in-fact pay, $27

per participant in recordkeeping fees during the relevant timeframe, Plaintiff would have paid less than $5, plausibly $0, in recordkeeping fees had Defendants been prudent and negotiated a lower fee.  (Doc. 42 at 12-13).  At this stage in the litigation, the Court views all plausible inferences in Plaintiff's favor.  Accordingly, based on the allegations of the Amended Complaint, Plaintiff has alleged an injury-in-fact.

### 2. Traceability

Defendants also argue that, assuming Plaintiff alleges an injury-in-fact, she fails to allege traceability.  Defendants contend that the decision to subsidize a portion of the recordkeeping fees was made by Kroger, as the employer, and is not traceable to Defendants, as the fiduciaries.  (Doc. 40-1 at 16; Doc. 44 at 9-10).  Stated differently, Defendants contend that the decision to subsidize the Kroger Plan was a business decision that does not impact ERISA's fiduciary duties, so any injury resulting from an unreasonable recordkeeping fee is not traceable to Defendants.

The plaintiff must show "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).  "[T]he standard for establishing traceability for standing purposes is less demanding than the standard for proving tort causation."  *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020) (citation omitted).  "At the pleading stage, the plaintiff's burden of 'alleging that their injury is "fairly traceable"' to the defendant's challenged conduct is 'relatively modest[.]'"  *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 171 (1997).  Thus, harms that flow "indirectly from the action in

question can be said to be 'fairly traceable' to that action for standing purposes." *Id.* (quotation omitted).

Plaintiff plausibly alleges traceability. Plaintiff's alleged injury—that she paid an unreasonable recordkeeping fee—is fairly traceable to Defendants' challenged conduct—that Defendants were imprudent by failing to solicit recordkeeper bids. Whether Kroger, as the employer, or Defendants, as the fiduciaries, made the decision to pay a portion of the recordkeeping fee is immaterial to the standing analysis because the challenged conduct is fairly traceable to Plaintiff's injury.

To be sure, the Sixth Circuit has "recognized that employers who are also plan sponsors wear two hats: one as a fiduciary in administering or managing the plan for the benefit of participants and the other as employer in performing settlor functions such as establishing, funding, amending, and terminating the trust." *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 718 (6th Cir. 2000) (citations omitted). Moreover, because the "fiduciary obligations imposed by ERISA are implicated only where an employer acts in its fiduciary capacity," a court "must examine the conduct at issue to determine whether it constitutes management or administration of the plan, giving rise to fiduciary concerns, or merely a business decision that has an effect on an ERISA plan not subject to fiduciary standards." *Id.* (cleaned up).

However, Defendants fail to explain how this analysis goes to the Court's standing inquiry. Moreover, whether the decision to subsidize the recordkeeping fee falls within Defendants' fiduciary functions is a fact dependent inquiry that the Court declines to engage in at this stage in the proceedings based on the allegations in the Amended

Complaint. *Id*. ("under the facts of this case, [the conduct] was a business decision"). Accordingly, Plaintiff has met her relatively modest burden of showing that her injury is fairly traceable to Defendants' challenged conduct.

### 3. *Redressability*

Finally, although the parties do not discuss it, Plaintiff's injury will be redressed by a favorable decision. A plaintiff who sues under Section 1132(a)(2) for breach of fiduciary duty does so to seek recovery on behalf of the plan. *Loren*, 505 F.3d at 608 ("Plaintiffs cannot bring suit under § 1132(a)(2) to recover personal damages for misconduct, but rather must seek recovery on behalf of the plan."). Here, Plaintiff's injury is redressable as any favorable decision will result in recovery to the Kroger Plan, which undoubtedly then flows to Plaintiff and other participants. Accordingly, at this stage in the proceedings, Plaintiff has plausibly alleged standing.

### B. Plaintiff fails to plausibly state a claim for relief.

Plaintiff asserts two claims against Defendants: (1) breach of the duty of prudence of ERISA based on failure to ensure objectively reasonable recordkeeping fees; and (2) failure to monitor other fiduciaries under ERISA in relation to the unreasonable recordkeeping fees. (Doc. 32). Defendants argue that both claims should be dismissed for failure to state a claim. (Doc. 40).

As discussed, ERISA "requires that a plan administrator discharge his duties 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" *CommonSpirit*, 37 F.4th

at 1164 (quoting 28 U.S.C. § 1104(a)(1)(B)). A court's review of an ERISA pleading "requires 'careful, context-sensitive scrutiny of a complaint's allegations' in order to 'divide the plausible sheep from the meritless goats.'" *Id.* (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)). "Because the content of the duty of prudence turns on the circumstances prevailing at the time the fiduciary acts, the appropriate inquiry will necessarily be context specific." *Id*. (cleaned up). "In the last analysis, 'the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise.'" *Id.* (quoting *Hughes*, 142 S. Ct. at 742, 211 L.Ed.2d 558).

### 1. *Count I (Duty of Prudence)*

Defendants argue that Plaintiff fails to plead a duty of prudence claim for three main reasons: (1) Plaintiff fails to allege that the Kroger Plan's fees were excessive relative to the services provided; (2) Plaintiff cannot plausibly plead her claim by comparing the Kroger Plan to other, handpicked plans from one single year; and (3) Plaintiff's comparable plans are not comparable plans.[3] (Doc. 40-1). Plaintiff's general response is that the allegations of the Amended Complaint create to a plausible inference that Defendants were imprudent through the Kroger Plan's excessive

---

[3] Defendants also argue that Plaintiff fails to plausibly allege a duty of prudence claim based on recordkeeping fees because Plaintiff did not, in fact, pay an unreasonable recordkeeping fee. This argument fails for the similar reasons as Defendants' standing argument.

recordkeeping fees, and Defendants' concerns with her pleading are factual issues not properly before the Court at this stage in the proceedings. (Doc. 42).

To allege a breach of fiduciary duty claim based on imprudent recordkeeping fees, a plaintiff must plead facts which would allow a plausible inference that the recordkeeping fees were excessive relative to the services rendered. *Forman*, 40 F.4th at 449; *CommonSpirit*, 37 F.4th at 1169; *see also*, *Albert v. Oshkosh Corp.*, 47 F.4th 570, 580 (7th Cir. 2022), *reh'g denied*, No. 21-2789, 2022 WL 4372363 (7th Cir. Sept. 21, 2022) (following *CommonSpirit*).

In this case, Plaintiff fails to allege that the Kroger Plan's recordkeeping fees were excessive when compared to services rendered. Plaintiff attempts to survive this burden by describing the "two types of essential RK&A services provided by all recordkeepers," and then arguing that "[f]or mega plans, like the Kroger Plan, any minor variations in the level and quality of RK&A services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers." (Doc. 32 at ¶¶ 39, 41; Doc. 32 at 17-19). But Plaintiff's allegations are wholly conclusory. *See Probst v. Eli Lilly and Company*, 1:22-cv-1106, 2023 WL 1782611, at *10 (S.D. Ind. Feb. 3, 2023) (allegation that "that all mega plans receive nearly identical recordkeeping services and that any difference in services was immaterial to the price of those services" was wholly conclusory) (collecting cases). Indeed, Plaintiff fails to give any context to the services rendered to the Kroger Plan or to the services rendered to her comparable plans which may lead to the inference that the Kroger Plan's recordkeeping fees were excessive relative to the services rendered.

Plaintiff's theory is also not plausible.  Again, Plaintiff alleges that "any minor variations" in recordkeeping services "have no material impact on the fees charged," suggesting that she need not describe the context of services rendered because any differences in services among her comparable plans are immaterial.  However, when the Court takes a careful, context-sensitive scrutiny of the comparable plans, Plaintiff's suggestion that minor variations are immaterial is not plausible.

Plaintiff's "comparable plans" receive recordkeeping services from other providers, and the cost of those fees range from $18 to $27 per participant.  Plaintiff relies on Form 5500's when calculating those fees.  But the Form 5500's show variations in reported services for the comparable plans.  For example, the Kroger Plan's 2018 Form 5500 states that Merrill Lynch provided "recordkeeping and investment management services to the [Kroger] Plan." (Doc. 40-4 at 28).[4]  Sutter Health's 2018 Form 5550 reflects that Vanguard provided services corresponding with the following codes: 37

---

[4] In the Amended Complaint, Plaintiff alleges that "[b]y disclosing service code[] 15 [Recordkeeping and information management (computing, tabulating, data processing, etc.)] in Schedule C of its 2020 [Kroger Defined Contribution Plan] Master Trust form, the Plan indicates that the only service provided by Merrill Lynch was recordkeeping."  According to Plaintiff, this shows that Bank of America and Merrill Lynch provided only Bundled RK&A services to the Kroger Plan.  (Doc. 32 at ¶ 15).

As an initial matter, the Master Trust's 2018 Form 5500 discloses that Bank of America provided service code 28 (investment management) and Merrill Lynch Pierce Fenner Smith provided service codes 15 and 72 (other investment fees and expenses) to the Master Trust.  *See* The Kroger Co. Defined Contribution Master Trust's 2018 Form 5500, available publicly online at https://www.efast.dol.gov/5500search/.  So, this calls into question what services were rendered by Bank of America and Merrill Lynch throughout the relevant time period.  Moreover, even if the Court assumes that Bank of America and Merrill Lynch only provided recordkeeping services to the Kroger Plan during the relevant time period, the variations in services provided by the comparable plans still fail to state a plausible claim that the fees charged by Bank of America and Merrill Lynch were excessive relative to the services rendered.

(participant loan processing), 60 (sub-transfer agency fees), 64 (recordkeeping fees), and

65 (account maintenance fees). (Doc. 40-11 at 11).[5] *See, e.g.*, *Probst*, 2023 WL

1782611, at *11 (questioning use of Form 5500s for comparable plans). Thus, the

differences in costs and the differences in services reported among the comparable plans

suggest that even minor variations in services impact per participant recordkeeping fees.

Moreover, even assuming variations in services have no material impact on

recordkeeping fees, Plaintiff fails to give the kind of context that creates an inference that

Defendants were imprudent when picking Merrill Lynch as a recordkeeper. Plaintiff

attempts to show that Defendants were imprudent because "comparable plans" received

similar services at a lower cost. But Plaintiff's "comparable plans" are not comparable

plans.[6] In 2018, the Kroger Plan had 90,005 participants, yet Plaintiff chooses

"comparable plans" ranging from 47,358 participants to 154,402 participants. In 2018,

---

[5] *See* Doc. 40-9 at 7 (Kaiser Permanente Supplemental Savings and Retirement Plan's 2018
Form 5500 reflecting Vanguard services for codes 15, 25, 26, and 37); Doc. 40-12 at 11 (Lowe's
401(k) Plan's 2018 Form 5500 reflecting Well Fargo services for codes 15, 21, 50, 62, and 64);
Marriott International, Inc. Employees' Profit Sharing Retirement and Savings Plan and Trust's
2018 Form 5500 reflecting Alight services for codes 15 and 50, available publicly online at
https://www.efast.dol.gov/5500search/; Apple 401(k) Plan's 2018 Form 5550 reflecting Great
West services for codes 15, 50, and 64, available at https://www.efast.dol.gov/5500search/.

[6] As another comparator, Plaintiff alleges that the recordkeeping fees are unreasonable based on
a stipulation by Fidelity in another ERISA fee case, *Moitoso, et al. v. FMR LLC, et al.*, 1:18-cv-
12122-WGY, ECF No. 138-67 at 3 (D. Mass.). (Doc. 32 at ¶¶ 83, 89). According to Plaintiff, in
that case, Fidelity took the position that, between the years of 2014 and 2020, it could have
negotiated a fixed recordkeeping fee of $14-$21 per participant for recordkeeping services
provided by Fidelity to a Fidelity plan. However, like prior cases, Plaintiff fails to provide
context as to what services Fidelity provided to its own plan, which may make the Fidelity plan a
meaningful comparator to the Kroger Plan. So, like prior cases, the Court declines to consider it.
*See e.g., Fritton v. Taylor Corp.*, No. 22CV00415ECTTNL, 2022 WL 17584416, at *8 (D.
Minn. Dec. 12, 2022) (declining to consider Fidelity stipulation as a "meaningful benchmark");
*Wehner v. Genentech, Inc.*, No. 20-CV-06894-WHO, 2021 WL 507599, at *6 (N.D. Cal. Feb. 9,

the Kroger Plan had around $4.9 billion in assets, yet Plaintiff chooses "comparable plans" ranging from around $3.1 billion to around $7.4 billion in assets. These differences in size call into question Plaintiff's comparable plans and whether the Kroger Plan's recordkeeping fees were excessive relative the services rendered. Indeed, common sense dictates that plans of different sizes have different bargaining power, resulting in different services and/or fees. *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) ("The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct.").

In a final attempt to support her claims, Plaintiff provides supplemental authority, *Peck v. Munson Healthcare*, No. 1:22-CV-294, 2022 WL 17260807 (W.D. Mich. Nov. 9, 2022). (Doc. 49). But *Peck* is distinguishable from this case. In *Peck*, a decision not binding on this Court, the court denied in part defendant's motion to dismiss, keeping plaintiff's recordkeeping fee claim alive. First, the court found a dispute of fact on the per participant fee that was inappropriate to consider on a motion to dismiss. *Id.* at *5. Specifically, defendant, based on an unauthenticated document and based on its own calculations, argued that the actual fee paid per participant was less than the amount plaintiff alleged and less than the amount plaintiff argued would have been reasonable. *Id.* at *4. Here, Defendants take Plaintiff's calculations as true. Moreover, in *Peck*, the

---

2021) (declining to consider Fidelity stipulation as an adequate market comparator because Fidelity was providing services to its own plans and plaintiff failed to explain how those services were equivalent to the services in the present cases).

court found that, in its judgment, plaintiff had "compared sufficiently similar plans" that could show that defendant acted as an imprudent fiduciary. *Id.*[7] Here, and as already discussed, that is simply not the case. Plaintiff has not compared sufficiently similar plans to the Kroger Plan.

To state a plausible claim that Defendants were imprudent when choosing a recordkeeper and negotiating recordkeeping fees, Plaintiff needed to allege facts that led to the inference that the recordkeeping fees paid were excessive relative to the services rendered. The Court has taken a "careful, context-sensitive scrutiny of [the Amended Complaint]'s allegations," and, for the foregoing reasons, finds that Plaintiff fails to move her claim from "possibility to plausibility." *CommonSpirit*, 37 F.4th at 1164, 1169. Accordingly, the motion to dismiss Count I is granted.

### 2. *Failure to Monitor Claim*

Plaintiff's second claim for relief alleges that Defendants breached their duty to monitor other fiduciaries responsible for the Kroger Plan's recordkeeping fees. (Doc. 32 at ¶¶ 131-37). "The sufficiency of these claims depends on the sufficiency of Plaintiff's breach of prudence claims." *Peck*, 2022 WL 17260807, at *8 (citations omitted); *see also Saumer v. Cliffs Nat. Res. Inc.*, No. 1:15-CV-954-DAP, 2016 WL 8668509, at *8 (N.D. Ohio Apr. 1, 2016), *aff'd*, 853 F.3d 855 (6th Cir. 2017) (dismissing failure to monitor claim because "no predicate fiduciary breach exists"); *Gonzalez v. Northwell*

---

[7] In *Peck*, the plan at issue has 7,259 participants with around $294 million in assets. Plaintiff then provided 16 "comparable plans," with many plans around the same number of participants and assets. *See* Amended Complaint, *Peck v. Munson Healthcare*, No. 1:22-CV-294, 2022 WL 17260807 (W.D. Mich. June 21, 2022), Doc. 9 at ¶ 95.

*Health, Inc.*, No. 20CV3256RPKRLM, 2022 WL 4639673, at *12 (E.D.N.Y. Sept. 30, 2022) (monitoring and co-fiduciary breach claims "cannot survive absent a viable claim for breach of a duty of prudence").  Accordingly, the motion to dismiss Count II is granted.

## V.    CONCLUSION

Based upon the foregoing, Defendants' motion to dismiss (Doc. 40) is **GRANTED**.  The Amended Complaint is **DISMISSED with prejudice**.   The Clerk shall enter judgment accordingly and terminate the action.

**IT IS SO ORDERED.**

Date:  ____3/9/2023_____                             ___*s/Timothy S. Black*_____
                                                        Timothy S. Black
                                                        United States District Judge